**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| JACOBS ENGINEERING GROUP, INC., a Delaware corporation, <br><br> Plaintiff, <br><br> v. <br><br> DAVID MASON & ASSOCIATES, INC., a Missouri corporation, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> Case No.: <br> Division: |

## Complaint

Plaintiff Jacobs Engineering Group, Inc., by and through undersigned counsel, for its Complaint against Defendant David Mason & Associates, Inc., states as follows:

### PARTIES, JURISDICTION, AND VENUE

1. Plaintiff Jacobs Engineering Group, Inc. ("Jacobs"), is a corporation organized under the laws of the State of Delaware with a principal place of business in Dallas, Texas.

2. Upon information and belief, Defendant David Mason & Associates, Inc. ("DMA") is a corporation organized under the laws of the State of Missouri with a principal place of business in Saint Louis, Missouri.

### JURISDICTION AND VENUE

3. Pursuant to 28 U.S.C. § 1332(a), the Court has jurisdiction of this civil action because the amount in controversy exceeds $75,000 and there is diversity between the parties.

4.  Venue is proper in the Eastern District of Missouri under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## FACTUAL BACKGROUND

5.  On January 21, 2021, Jacobs and Metropolitan St. Louis Sewer District ("MSD") entered Contract No. 21994 ("MSD Contract") for Jacobs to design and build improvements at the Bissell Point Wastewater Treatment Plant in St. Louis, Missouri including the Bissell Point WWTF Fine Screen, Concrete and Gate Improvement Project (the, "Project"). The MSD Contract is attached hereto as **Exhibit A.**

6.  Section 2.2 of the MSD Contract states: "[Jacobs'] services shall be performed with the skill and care which would be exercised by comparable professionals." Ex. A, § 2.2.

7.  MSD Contract's indemnification terms state:

> [Jacobs] shall defend, indemnify and save harmless the [MSD] its Trustees and employees, from and against any and all claims (including but not limited to attorneys' fees), suits, causes of action, judgments or damages on account of any liability, including personal injuries or bodily injury, including death or property damages, sustained or claimed to be sustained by any person or persons, to the extent caused by, to the extent arising out of, or the extent resulting from any negligent act or omission on the part of the [Jacobs] or any Subcontractor, their agents or employees, in any way related to the services performed under this Agreement.

Ex. A, § 9.1.

8.  On February 19, 2021, Jacobs and DMA entered into a Field Services Agreement, #149022337 ("Agreement") where DMA was subcontracted to provide

2

structural engineering services for the Project. DMA is identified as "Subcontractor" or "Subconsultant" in the Agreement which is attached hereto as **Exhibit B**.

9. Section 2.12.1 of the Agreement states:

> Subcontractor shall perform its Work with standards specified in the Prime Contract and this Agreement. If Subcontractor's Work fails to conform to the foregoing requirements, without waiver of or prejudice to any other rights or remedies Jacobs may have and without limitation of Subcontractor's representations hereunder, Subcontractor shall make good such deficiencies and any damage or loss caused by the deficient Work at Subcontractor's expense and without cost to Jacobs. Neither acceptance of all or any part of the Work by Jacobs, nor any payment made by Jacobs, shall relieve the Subcontractor of its responsibilities hereunder.

10. Section 2.13.4 of the Agreement states, "Jacobs may return all or any portion of the Work for credit or require prompt modification, repair, adjustment, correction, or replacement ("Correction") of any portion of the nonconforming Work at Subcontractor's cost.

11. The Agreement also provides that DMA is to defend, indemnify, and hold Jacobs harmless:

> SUBCONTRACTOR AGREES TO DEFEND, INDEMNIFY AND HOLD JACOBS, ITS AFFILIATED COMPANIES AND THE CLIENT, AND THE DIRECTORS, OFFICERS AND EMPLOYEES OF EACH OF THEM (THE "INDEMNITEES") HARMLESS, UNDER ALL OF THE SAME TERMS BY WHICH JACOBS IS OBLIGATED TO DEFEND, INDEMNIFY AND/OR HOLD HARMLESS THE CLIENT UNDER THE VARIOUS PROVISIONS OF THE PRIME CONTRACT. WITHOUT LIMITATION, SUCH OBLIGATIONS SHALL ALSO APPLY TO CLAIMS, SUITS AND ACTIONS ASSERTED BY EMPLOYEES OF SUBCONTRACTOR.
>
> IN ADDITION, SUBCONTRACTOR AGREES TO DEFEND, INDEMNIFY AND HOLD INDEMNITEES HARMLESS FROM ANY CLAIMS, DAMAGES, LOSSES, AND COSTS, INCLUDING,

BUT NOT LIMITED TO, ATTORNEY'S FEES AND LITIGATION COSTS, TO THE EXTENT CAUSED BY THE PERFORMANCE OR NON-PERFORMANCE OF WORK, BREACH OF CONTRACT, NEGLIGENCE, OR WILLFUL MISCONDUCT OF SUBCONTRACTOR'S EMPLOYEES, AFFILIATED CORPORATIONS, OFFICERS, AND LOWER-TIER SUBCONTRACTORS IN CONNECTION WITH THE WORK.

. . .

SUBCONTRACTOR'S DUTY TO DEFEND, INDEMNIFY, AND HOLD INDEMNITEES HARMLESS SHALL INCLUDE, AS TO ALL CLAIMS, DEMANDS, LOSSES, AND LIABILITY TO WHICH IT APPLIES, INDEMNITEES AND/OR INDEMNITEES' PERSONNEL-RELATED COSTS, REASONABLE ATTORNEYS' AND EXPERTS' FEES, COURT COSTS, AND ALL OTHER CLAIM-RELATED EXPENSES.

BY SIGNING BELOW, THE PARTIES CERTIFY THAT THE WAIVER OF IMMUNITY CONTAINED IN THIS ARTICLE WAS MUTUALLY NEGOTIATED.

Ex. B, pp. 3-4.

12. Section 5.2.2 of the Agreement states that in the event a dispute between Jacobs and DMA arises, the parties agree, "that the non-prevailing party in litigation shall pay, in addition to any judgment, reasonable attorneys' fees, prejudgment interest and costs incurred by the prevailing party as a result of the court proceedings."

13. Pursuant to the Agreement, DMA agreed to "perform professional services for [the Project] as follows: [DMA] shall perform surveying to establish control, topographic surveying, and property line strip map. [DMA] shall perform professional engineering design and bid-phase services including input to Basis of Design Report, 30% deign (sic), 60% design, 95% design, 100% design, and bid-phase services for the structural and architectural work associated with the [Project]." Ex. B, Attachment C, p. 23-24.

14. To aid DMA in completing its scope of work under the Agreement, Jacobs provided DMA with a geotechnical report dated September 22, 2022, titled "Bissell Point Wastewater Treatment Plant New Fine Scree Facility-Geotechnical Engineering Design Report" (the "Geotechnical Report") for use in designing the below grade wall for Project. The Geotechnical Report is attached hereto as **Exhibit C**.

15. The Geotechnical Report was performed as part of the 30% design.

16. The Geotechnical Report was intended to be read as a whole, not in sections.

17. When drafting the Geotechnical Report, Jacobs consulted with DMA.

18. The Geotechnical Report contained a series of data points that the Structural Engineer, here DMA, should have analyzed together.

19. Geotechnical Report Table 6 (below) provided the recommended unit weights and earth pressure coefficients for unsaturated soils.

Table 6 – Recommended Lateral Earth Pressures

| Backfill Materials | Effective Friction Angle | Est. Unit Weight | Earth Pressure Coefficients | | | Equivalent Fluid Pressures[1] | | |
|---|---|---|---|---|---|---|---|---|
| | | | At-Rest $K_o$ | Active $K_a$ | Passive $K_p$ | At-Rest | Active | Passive[2] |
| On-Site soils | 28° | 125 pcf | 0.53 | 0.36 | 2.77 | 66 psf/ft | 45 psf/ft | 173 psf/ft |
| Well-Graded Stone (MODOT Type 5) | 35° | 135 pcf | 0.42 | 0.27 | 3.69 | 57 psf/ft | 36 psf/ft | 249 psf/ft |
| Free-Draining Crushed Stone (1-inch-clean) | 32° | 115 pcf | 0.47 | 0.31 | 3.25 | 54 psf/ft | 35 psf/ft | 186 psf/ft |

1. The provided fluid pressures are based on material not being saturated. If the materials are permitted to saturate, modified values will be required to account for the hydrostatic load on the wall/footing.
2. Due to the large strains required to fully mobilize the passive earth pressure, a factor of safety of 2 has been applied to the recommended passive fluid pressure.

20. In Footnote 1 to Table 6 Jacobs highlighted for the structural engineer that the lateral pressures were not to be used for saturated soils: "[t]he provided fluid pressures are based on material not being saturated. If the materials are permitted to saturate, modified

values will be required to account for the hydrostatic load on the wall/footing." **Ex. C.** at n. 1.

21. The report advised that groundwater levels could rise significantly in the area of the Project during major Mississippi River flood stages.

22. In contracting with Jacobs, DMA represented that it has inspected the site where the work was to be performed and satisfied itself fully as to all existing conditions.

23. DMA, based on its representations and noted experience in the geographic area, knew or should have known that the soils were expected to be saturated.

24. DMA designed the below-grade structural walls for unsaturated soils and did not indicate on DMA's drawings that drainage was to be included.

25. During the pendency of the project, Jacobs was made aware by the client, MSD, about concerns with DMA's work on another MSD project.

26. During review of DMA's design, it was discovered that DMA's structural engineer did not heed the advised that groundwater levels could rise significantly.

27. As a result, DMA incorrectly designed the structures which only accounted for lateral earth pressures from only unsaturated soils.

28. DMA's errors and omissions in its design constitute an error by DMA that caused DMA's design to fall below the acceptable standard of care which would be exercised by comparable professionals.

29. Jacobs also identified several other errors and omissions in DMA's design which caused DMA's design to fall below the acceptable standard of care which would be exercised by comparable professionals.

30. The errors and omissions in DMA's below grade design caused DMA's design to fall below the acceptable standard of care which would be exercised by comparable professionals include:

    a. the influent and effluent channel base slabs were under designed;

    b. the base slab beneath the channel divider walls was under designed - the slab was not thick enough for development of wall vertical dowels and there was not enough reinforcement to transfer moment from wall to base slab; and

    c. the base slab beneath the channel outer wall was under designed - the slab was not thick enough for development of wall vertical dowels, there was not enough reinforcement to transfer moment from wall to base slab, and it was not designed for tension in slab from water pushing the base of wall outward.

31. The errors and omissions in DMA's above grade design which caused DMA's design to fall below the acceptable standard of care which would exercised by comparable professionals include:

    a. the crane beam was originally designed to be a W21x62 which was undersized for the application and was revised to W21x62 + C12x20.7;

    b. the beam BM1 on Grid B that supports the low roof was not designed adequately and needed to be redesigned by making the beam deeper or adding reinforcement;

7

c.  one of the non-participating shear walls on Grid B needed to be revised to be a shear wall;

d.  the tops of the interior screening channel walls needed to be braced during construction until the top slab was placed;

e.  on Sheet S-17, the N-S control joint between rows 4 and 5 needed to be removed since masonry walls are continuous over the joint;

f.  on Sheet S-18, the load path from columns on row 2 to lower roofs to shear walls was not correct;

g.  on Sheet S-19, the wind and snow loads were incorrect;

h.  detail 1/S-31, the anchorage capacity was not adequate;

i.  detail A/S-32, the concrete corbel top bars needed to terminate with a standard hook at the outside face of the corbel. Clearances for crane beam were not designed correctly;

j.  in Section E/S-33, the #4 x 4'-0" should have been grouted into cells and not in the joint/keyway between the planks;

k.  in details A and B of Sheet S-36, the connection between the L-beams, beam BM-5 and the column needed to be fully detailed. The column vertical reinforcement needed to extend to the top of the beam BM-5. There should have been a horizontal construction joint at the bottom of the L-beam.

l.  in details A and B of Sheet S-36, the beams should be cast at the same time.

8

  m. in details A and B of Sheet S-36, the 'L' construction joint as shown did not allow for development of the BM-5 reinforcement into the column.

  n. On sheet S-37, the BM-5 was incorrectly described as precast in the schedule (detail 1).

32. Both Jacobs and DMA submitted corrected plans to address the errors and omissions identified in DMA's initial plans for the Project.

33. MSD selected the corrected plans prepared by Jacobs for the Project.

34. On November 20, 2023, Jacobs received notice from MSD that MSD may have a claim against Jacobs due to apparent errors in the design provided for the Project. MSD identified that the apparent errors and omissions were "attributable to the acts or omissions of Jacobs including [DMA]." The November 20, 2023, Notice from MSD is attached hereto as **Exhibit D**.

35. On December 20, 2024, pursuant to the Indemnification terms in the Agreement, Jacobs sent DMA a demand placing DMA on notice of MSD's claims and seeking defense and indemnification arising from all claims, demands, and lawsuits brought by MSD against Jacobs. The December 20, 2024, Demand from Jacobs to DMA is attached hereto as **Exhibit E**.

36. On January 13, 2025, pursuant to the Indemnification terms in the Agreement, Jacobs sent DMA a revised demand again placing DMA on notice of MSD's claims and seeking defense and indemnification arising and to be held harmless from all claims, demands, and lawsuits brought by MSD against Jacobs. The January 13, 2025,

Revised Demand from Jacobs to DMA is attached hereto as **Exhibit F**. Jacobs also demanded DMA's insurance carriers immediately add Jacobs as an additional insured. *See id.*

37. DMA rejected Jacobs' indemnity and defense demand and failed to hold Jacobs harmless.

38. On March 18, 2025, Jacobs provided additional correspondence to DMA outlining additional deficiencies with DMA's performance under the Agreement. The March 18, 2025, Correspondence is attached hereto as **Exhibit G**.

39. On May 30, 2025, MSD conveyed a formal settlement demand to Jacobs in the amount of $1,950,000, a reduced amount from MSD's initial demand to Jacobs. The May 30, 2025, Formal Settlement from MSD is attached hereto as **Exhibit H**.

40. On June 3, 2025, Jacobs sent a revised demand placing DMA on notice of MSD's claims and seeking defense and indemnification arising from all claims, demands, and lawsuits brought by MSD against Jacobs. The June 3, 2025, Revised Demand from Jacobs to DMA is attached hereto as **Exhibit I**.

41. Throughout this process, Jacobs communicated with DMA about MSD's claims. Jacobs invited DMA to participate in the discussion with MSD. Jacobs invited DMA to provide comments on the claims and damages asserted by MSD.

42. On June 4, 2025, Jacobs again communicated with DMA seeking indemnification. The June 4, 2025, Correspondence is attached hereto as **Exhibit J**.

43. On June 10, 2025, in good faith and pursuant to arm's length negotiations, Jacobs and MSD agreed to settle MSD's claims against Jacobs arising from DMA's non-

performance and breach for $1,950,000. The settlement was fair and reasonable in light of MSD's claims and reported damages which were expected to increase.

44. DMA has refused to indemnify and defend Jacobs in relation to the MSD's demand and claims. DMA refused to contribute to the settlement Jacobs negotiated with MSD.

## COUNT I: INDEMNITY

45. Jacobs incorporates Paragraphs 1 through 35 as if fully set forth herein.

46. Jacobs and DMA entered into the Agreement. *See* **Ex. B**.

47. Jacobs performed its obligations and met all necessary conditions under the Agreement.

48. The errors in DMA's design caused DMA's design to fall below the acceptable standard of care to be exercised by comparable professionals.

49. As a result of DMA's errors and omissions, causing its design to fall below the acceptable standard of care to be exercised by comparable professionals, MSD alleged claims against Jacobs and made a demand. *See* **Exs. D, H.**

50. Pursuant to the indemnification terms of the Agreement, DMA is obligated to defend, indemnify, and hold DMA harmless for claims under all of the same terms Jacobs is obligated to defend, indemnify and/or hold harmless MSD under the prime contract's provisions.

51. DMA is obligated to defend, indemnify and hold Jacobs "harmless from any claims, damages, losses, and costs, to the extent caused by the performance or non-performance of work, breach of contract, negligence, or willful misconduct of [DMA's]

11

employees, affiliated corporations, officers, and lower-tier subcontractors in connection with the work.

52. Jacobs has made demand upon DMA to defend and indemnify Jacobs and hold Jacobs harmless with respect to the demand and claims made by MSD arising from DMA's non-performance and breach of the Agreement.

53. Jacobs has been forced to retain counsel and incurred costs and expenses responding to MSD's demand and the claims MSD brought against Jacobs.

54. DMA has refused to defend and indemnify Jacobs and has refused to hold Jacobs harmless.

55. By DMA's refusal to defend and indemnify Jacobs, the good faith and arm's length settlement between Jacobs and MSD is binding on DMA.

56. Jacobs has and will continue to incur damages including, but not limited to, attorneys' fees and expenses in good faith settling the demand and claims made by MSD.

57. Jacobs is entitled to damages against DMA in an amount of:

   a. $1,950,000 – the fair and reasonable settlement with MSD; and

   b. $178,339.91 – the costs Jacobs incurred resulting from DMA's design falling below the acceptable standard of care which would be exercised by comparable professionals.

WHEREFORE, Plaintiff Jacobs Engineering Group. Inc. respectfully requests that this Court enter a judgment in its favor and against Defendant David Mason & Associates, Inc. for breach of contract and for all liability, losses, costs, and expenses identified in this Complaint, including damages in an amount of $2,128,339.91, attorneys' fees, any related

12

expenses such as court costs, pre-judgment interest, post-judgment interest, and for such other and further relief as the Court deems just and proper under the circumstances.

## COUNT II: BREACH OF CONTRACT

58. Jacobs incorporates Paragraphs 1 through 48 as if fully set forth herein.

59. Jacobs entered a valid and legally binding contractual relationship with DMA. *See* **Ex. B.**

60. DMA breached Section 2.12.1 of the Agreement when by incorrectly using lateral earth pressure contained in the Geotechnical Report. and by making errors in the above the grade and below the grade designs. *See supra* ¶¶ 21-22.

61. The errors with DMA's design plans caused DMA's design to fall below the acceptable standard of care to be exercised by comparable professionals.

62. As a result of DMA's errors and its design falling below the acceptable standard of care to be exercised by comparable professionals, MSD alleged claims against Jacobs and made a demand. *See* **Exs. D, H.**

63. As a result of DMA's breach of the Agreement, Jacobs is entitled to damages against DMA in an amount of:

    a. $1,950,000 – the fair and reasonable settlement with MSD; and

    b. $178,339.91 – the costs Jacobs incurred resulting from DMA's design falling below the acceptable standard of care which would be exercised by comparable professionals.

64. Jacobs has been forced to retain counsel and has incurred and will continue to incur attorneys' fees, costs, and other legal expenses in pursuing these claims.

WHEREFORE, Plaintiff Jacobs Engineering Group. Inc. respectfully requests that this Court enter a judgment in its favor and against Defendant David Mason & Associates, Inc. for breach of contract and for all liability, losses, costs, and expenses identified in this Complaint, including damages in an amount of $2,128,339.91, attorneys' fees, any related expenses such as court costs, pre-judgment interest, post-judgment interest, and for such other and further relief as the Court deems just and proper under the circumstances.

October 21, 2025

        HUSCH BLACKWELL LLP

        By: */s/* Kenneth A. Slavens
            Kenneth A. Slavens, Bar No. 28081
            Michael P. Nolan, Bar No. 54046
            Kaitlin M. Little, Bar No. 73822
            8001 Forsyth Blvd., Suite 1500
            St. Louis, MO  63105
            Telephone:  (314) 480-1500
            Facsimile:  (314) 480-1505
            ken.slavens@huschblackwell.com
            michael.nolan@huschblackwell.com
            katie.little@huschblackwell.com

        *Attorneys for Jacobs Engineering Group, Inc.*